## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### (Southern Division)

| | |
|---|---|
| **SAAB AUTOMOBILE AB**<br>Åkerssjövägen 10<br>Trollhättan 461 80<br>Kingdom of Sweden;<br><br>**SPYKER N.V.**<br>**f/k/a SWEDISH AUTOMOBILE N.V.**<br>**f/k/a SPYKER CARS N.V.**<br>Edisonweg 2<br>3899 AZ Zeewolde<br>The Netherlands;<br><br>       Plaintiffs,<br><br>v.<br><br>**GENERAL MOTORS COMPANY**<br>300 Renaissance Center<br>Detroit, Michigan 48265-3000;<br><br>       Defendant. | Civil Action No.: _____<br><br>**JURY TRIAL DEMANDED** |

### VERIFIED COMPLAINT

This lawsuit seeks redress for the unlawful actions of General Motors Company ("GM") to avoid competition with Saab in the Chinese market. GM's actions had the direct and intended result of driving Saab Automobile AB ("Saab") into bankruptcy by tortiously interfering with a transaction with Chinese investors that would have permitted Saab to restructure and remain a solvent, going concern. In support of their claim for tortious interference with economic expectancy, Plaintiffs aver as follows:

### JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332 because Plaintiffs Saab and Spyker N.V. ("Spyker") are citizens or subjects of foreign

5245160

states, Defendant GM is a citizen of Delaware and Michigan, and the amount in controversy

exceeds the sum or value of $75,000, exclusive of interest and costs.

2.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)

because GM resides here.  GM is an entity with the capacity to sue and be sued in its common

name and is subject to this Court's general personal jurisdiction.  28 U.S.C. § 1391(c)(2).

## PARTIES

3.     Plaintiff Saab Automobile AB is a stock company organized under the laws of the

Kingdom of Sweden with its principal place of business in Trollhättan, Sweden.  Saab is

currently in receivership, and the majority of its assets are in the process of being purchased by

National Electric Vehicle Sweden AB.

4.     Saab has a history going back sixty-five years.  It was founded shortly after World

War II out of Svenska Aeroplan AB and began manufacturing automobiles in 1949.  Saab was

appointed by the King of Sweden as the official purveyor of automobiles to the Court of Sweden.

At its peak in 2006, Saab sold 133,000 vehicles.

5.     In order to gain a stronger foothold in Europe in anticipation of the economically

borderless common market, which was expected to be implemented by 1992, GM purchased a

50% interest in Saab-Scania AB for $600 million in January 1990.  As part of that transaction,

GM and Saab-Scania AB formed a new independent Swedish car company, Saab Automobile

AB.

6.     A GM spokesman at the time stated that GM envisioned component sharing in its

European operation and that "Saab will have access to our component and engineering

operations in Europe[.]"

7.     In January 2000, GM exercised an option to purchase the remaining 50% of Saab

2

5245160

Automobile AB, making it a wholly owned subsidiary of GM.  Saab continued to be a wholly owned subsidiary of GM until February 2010.

8.      Plaintiff Spyker is a public limited liability company organized under the laws of the Netherlands and has its principle place of business in Zeewolde, Netherlands.  Spyker is the current parent company to Plaintiff Saab.

9.      On February 23, 2010, Spyker finalized a deal with GM to purchase Saab. Through the transaction, Spyker contributed $74 million in cash, and the European Investment Bank provided a €400 million loan guaranteed by the Swedish government.  As a result of the transaction, Spyker acquired a majority interest in Saab, and GM retained a minority interest through preferred shares valued in January 2010 at approximately $326 million.  GM's minority interest represented just 0.000005% of shareholder voting power.

10.     On June 15, 2011, Spyker amended its articles of association to change its name from Spyker Cars N.V. to Swedish Automobile N.V., and changed its ticker symbol to SWAN.

11.     On April 18, 2012, Spyker amended its articles of association to change its name from Swedish Automobile N.V. to Spyker N.V.

12.     Defendant General Motors Company is a public corporation organized under the laws of the state of Delaware and maintains its principal place of business at 300 Renaissance Center in Detroit, Michigan.

13.     Through joint ventures, General Motors is the largest car seller in China and regards China as one of its largest and fastest growing markets.

**RELEVANT NON-PARTIES**

14.     Victor Muller is the founder and Chief Executive Office of Spyker.  He is also the chairman and Chief Executive Officer of Saab.

15.     Stephen Girsky is GM Vice Chairman of Corporate Strategy and Business

3

5245160

Development.  He has responsibility for corporate strategy, business alliances, new business development and other related areas.  Mr. Girsky was a key point of contract between Saab, Spyker and GM.

16.    Michael Millikin is GM's Senior Vice President and General Counsel.

17.    Gil Kaminski is an in-house attorney with GM.  Mr. Kaminski was a key point of contract between Saab, Spyker and GM.

18.    James Cain is an official spokesperson for GM.

19.    David Xu is a representative of Tempo Holding, a major Chinese automobile manufacturer, parts supplier, and investment company.  During the March 2011 International Motor Show in Geneva, Switzerland, Messrs. Girsky and Muller met to discuss problems that Saab was experiencing in making certain payments to GM, which could lead to a production stoppage.  As a result of that discussion, Mr. Girsky offered to introduce Mr. Muller to Mr. Xu and, in fact, made that introduction via email on March 1, 2011.

20.    Rongcheng HawTai Automobile Co. Ltd. ("Hawtai") is a large automobile manufacturer in China.  At present, Hawtai has an annual production capacity of 200,000 vehicles.

21.    Zhejiang Youngman Lotus Automobile Co., Ltd. ("Youngman") is a large Chinese manufacturer that produces commercial vehicles, busses, passenger cars and automobile components.

22.    Zhejiang Youngman Passenger Car Group Co., Ltd. ("Youngman Passenger Car") is a subsidiary of Youngman.  Youngman Passenger Car designs and manufactures automobiles, including Lotus cars, MAN trucks and Neoplan busses.

23.    Pang Qingnian is the founder of Youngman.

4

5245160

24.     Pang Caiping, a/k/a Rachel Pang, is an executive director of a subsidiary of Youngman and the daughter of Pang Qiagnian.  At all relevant times, Ms. Pang had authority to negotiate on behalf of and bind Youngman.

25.     Pang Da Automobile Trade Co., Ltd. ("Pang Da") is China's largest publicly traded automobile distributor.  As of the end of 2010, Pang Da had established more than 1,100 sales outlets in 23 Chinese provinces, cities and autonomous regions.

## FACTUAL ALLEGATIONS

### General Motors Seeks to Dominate the Chinese Automobile Market

26.     China is the world's single largest market for the sale of automobiles, having surpassed the United States as the world's largest market in 2010.  China represents the largest single national market for GM, as well.

27.     China exceeds all other marketplaces in importance to GM.  Indeed, GM now sells more Buick models, for example, in China than in the United States.

28.     GM operates 11 joint ventures in China in addition to two wholly owned foreign enterprises.  It has more than 35,000 employees in China.

29.     In recent years, GM's sales have increased dramatically in China.  In 2003, Shanghai GM, a joint venture between GM and SAIC Motor Corp. Ltd., sold approximately 200,000 vehicles in China.  By 2011, Shanghai GM had increased its annual sales to more than 1.2 million vehicles.

30.     Of GM's 2011 vehicle sales in China, Buick accounted for 645,537 vehicles. This represented growth of 17.5% over the prior year's sales.  Buick is one of GM's fastest growing brands in China.

31.     In 2011, Chinese sales accounted for more than three-fourths of General Motors

International Operations' sales volume.

32.     GM has affirmatively sought to demonstrate the importance of the Chinese market to its shareholders and the public.  To that end, GM's Chairman and Chief Executive Officer, Daniel Akerson, visited China three times in 2011, and the GM Board of Directors met in Shanghai, China, in December 2011.

33.     In April 2012, GM announced at the Beijing auto show that it would begin manufacturing the Cadillac XTS sedan in China as part of is strategy of introducing one new Cadillac model into the Chinese market each year through 2016.

34.     GM regularly touts the importance of the Chinese market.  In January 2012, GM issued a press release under the heading "General Motors Sets Sales Record in China in 2011." The press release reports that GM and its joint ventures sold more than 2.5 million vehicles in China in 2011.

35.     GM's market share in China was greater than Saab's ever was or could have been in the near future.  During all of 2007, 2008, 2009, and 2010, Saab manufactured fewer than 133,000 vehicles, and just a few thousand of those units were sold in China in any given year.  In 2008, GM halted its imports of Saab automobiles into China altogether.  Not until December 2010 had Saab entered into a memorandum of understanding with China Automobile Trading Co. Ltd. to reenter the Chinese market.  Saab contemplated initial annual sales in China of only 2,000-5,000 vehicles, and as of December 2010, aimed to sell 120,000 vehicles globally by 2012.

36.     The Chinese marketplace is highly competitive.  GM faces stiff competition from rivals like Volkswagen, Ford, and others.  In 2011, GM and Volkswagen sold nearly the same number of vehicles in China.  Without counting GM's low-cost and low-profit Wuling model, Volkswagen sales outpaced GM's significantly.

5245160

37.     In its latest Form 10-K, GM reported to the U.S. Securities and Exchange

Commission:

> **Our business in China is subject to aggressive competition and is sensitive to economic and market conditions.** Maintaining a strong position in the Chinese market is a key component of our global growth strategy. The automotive market in China is highly competitive, with competition from many of the largest global manufacturers and numerous smaller domestic manufacturers. As the size of the Chinese market continues to increase, we anticipate that additional competitors, both international and domestic, will seek to enter the Chinese market and that existing market participants will act aggressively to increase their market share. Increased competition may result in price reductions, reduced margins and our inability to gain or hold market share. In addition, our business in China is sensitive to economic and market conditions that drive sales volume in China. If we are unable to maintain our position in the Chinese market or if vehicle sales in China decrease or do not continue to increase, our business and financial results could be materially adversely affected.

38.     General Motors views the Chinese market as "the fastest growing global market

by volume of vehicles sold, as important to our global growth strategy and [it is] employing a

multi-brand strategy, led by our Buick and Chevrolet brands."

39.     Given the highly competitive climate in the Chinese automobile market, GM has

strong incentive to limit its competition wherever possible.

### Saab Automobiles

40.     As is common in the automobile manufacturing industry, Saab automobiles are

constructed based on a variety of platforms.

41.     An automobile platform is a set of common design and engineering elements used

in the manufacture of multiple different models of automobiles. Automobiles constructed on a

particular platform may share, for example, basic structural components, suspensions, steering

mechanisms, engines and powertrain components.

7

42.     Automobile manufacturers often license automobile platforms to other manufacturers within a commonly owned group of companies.

43.     Saab has manufactured many models of automobiles over the years.  Saab's final production models were the "9-3," and the "9-5."  These and a number of other legacy automobiles, like the "9-7," were based on GM automobile platforms.

44.     The Saab 9-3 was a compact automobile manufactured from 1998 through 2011.  Starting in 2002 the 9-3 was constructed on GM's Epsilon platform.

45.     The Saab 9-4X was a midsized vehicle that began production in 2011.  As a result of GM's unlawful conduct which led to the financial collapse of Saab, fewer than 600 of the Saab 9-4X were manufactured.  The Saab 9-4X was based on GM's Theta Premium platform.

46.     The Saab 9-5 was a midsized vehicle that was manufactured from 2003 through April 2011, with a newly redesigned model manufactured from June 2010 through the end of production.  The Saab 9-5 was based on GM's Epsilon GME or Epsilon II platform.

47.     The Saab 9-7X was a Saab-branded sports utility vehicle.  It was constructed on GM's GMT360 automobile platform.  The Saab 9-7X was in production from 2005 through 2009.

48.     GM owns the rights to the GM platforms on which the Saab 9-3, 9-4X, 9-5, and 9-7X were built.  As set forth in more detail below, Saab had a limited, non-exclusive license to use the necessary GM platforms for the manufacture of these models.

49.     Not all Saab vehicles used GM platforms.

50.     At the March 2011 International Motor Show in Geneva, Saab premiered the Saab PhoeniX, which was based on Saab's PhoeniX platform.  GM owns no rights in Saab's PhoeniX platform.

8

51.     The PhoeniX platform was independently developed and fully scalable with the specific goal in mind that Saab not be dependent on obtaining licenses to use GM's proprietary technology for the manufacture of vehicles based on the PhoeniX platform.

52.     Aside from the PhoeniX concept car premiered at the Geneva International Motor Show in 2011, Saab intended that the 2013 Saab 9-3 would be the first production model based on the PhoeniX platform.

**General Motors Sells Saab to Spyker**

53.     The economic crisis in 2008 had a major impact on GM.  In June 2009, GM filed for reorganization under Chapter 11 of the Bankruptcy Code.  GM did not emerge from bankruptcy until November 2010.

54.     While in bankruptcy, GM sought to shed brands that it did not view as profitable or economically advantageous to maintain.  To that end, during the course of the bankruptcy proceeding, brands such as Pontiac, Oldsmobile, Saturn and Hummer were discontinued entirely.

55.     Saab, which allegedly had not been profitable since 2001, was one of the brands that GM sought to sell or discontinue.

56.     Beginning at least as early as June 2009, GM entertained a number of offers to purchase or otherwise restructure Saab.  Ultimately, GM and Spyker were able to come to an agreement for the sale of Saab.

57.     GM agreed to sell to Spyker a majority interest in Saab Automobile AB in exchange for $74 million in cash and $326 million worth of redeemable preference shares.  In connection with the transaction, the Swedish government also agreed to guarantee a €400 million loan from the European Investment Bank.

58.     The terms of the deal were memorialized in a number of agreements executed on

5245160

February 23, 2010.

59.     The United States – Master Agreement ("Master Agreement") was one of the major agreements in the transaction.  The Master Agreement is an agreement between GM and Saab whereby GM transferred ownership and control of the Saab brand to Saab through the execution of a number of other, related agreements.  These included a bill of sale pursuant to which GM sold to Saab GM's inventory of Saab service parts; a 94X Supply Agreement, pursuant to which GM agreed to supply Saab with certain models of finished Saab 9-4X vehicles, a Powertrain Supply Agreement, pursuant to which GM agreed to supply Saab with powertrains to be used in certain Saab vehicles, and a Saab Services Parts Sale Agreement, pursuant to which GM sold Saab certain assets relating to the Saab service parts business.  A copy of the Master Agreement is attached as **Exhibit A**, and its terms are incorporated herein by reference.

60.     Another key agreement in the transaction was the Automotive Technology License Agreement ("ATLA"), a copy of which is attached as **Exhibit B**, and the terms of which are incorporated herein by reference.

61.     The ATLA is a contract between GM Global Technology Operations, Inc. ("GTO") and Saab.

62.     GTO is the GM-affiliated entity with the rights to various GM automobile platforms and other GM intellectual property used in the manufacture of certain Saab vehicles.

63.     Under the terms of the ATLA, GTO granted to Saab a non-exclusive, non-transferable, worldwide, royalty-free license to GM intellectual property necessary for the manufacture, assembly and service of Saab 9-5 and 9-3 models identified in exhibits to the ATLA (the "Licensed Vehicles").

5245160

64.    The purpose of the license was to permit Saab to make and assemble the Licensed Vehicles.

65.    Paragraph 4.2(a) of the ATLA contains a significant limitation on the license. That paragraph provides that:

> with respect to the People's Republic of China, including Hong Kong and Macao (but excluding Taiwan), prior written GTO consent is required for the manufacture and assembly of the Licensed Vehicles in the People's Republic of China; and the Parties agree that it would not be unreasonable for GTO to require that SAAB give a right of first offer for assembly to a GTO nominee, it being understood that if the GTO nominee's commercial terms are less favorable than an alternative assembler, SAAB may use such alternative assembler.

66.    Paragraph 14.9(b) further sets forth that Saab may not assign or transfer its rights to the GM licenses or delegate its obligations under the ATLA without the prior written consent of GTO.

67.    The restrictions on the license granted by the ATLA to Saab did not, and could not, restrict in any way Saab's use of the technology it developed itself independently, including the PhoeniX platform.

68.    At no time did GM have a right to approve or disapprove of any business transaction to license or sell exclusively Saab-developed and owned intellectual property, including the PhoeniX platform.

69.    At all times relevant, GM knew that it did not own or have any rights in the PhoeniX platform or other Saab-developed and owned intellectual property.

70.    Following consummation of the various agreements referenced in the Master Agreement, Saab had a license to continue to use necessary GM platforms and other technology for the manufacture and distribution of the 9-3 and 9-5 models; and Spyker acquired a

5245160

controlling interest in Saab.

### Saab Experiences Financial Difficulties

71.     On February 23, 2010 Saab effectively exited a voluntary liquidation, which GM had initiated on January 8, 2010.  Saab had no cars in production, no material on order, very low global inventory, several product development projects on hold and no marketing activities.

72.     Manufacturing was restarted on March 22, 2010 after a complete seven week standstill.  After resolving persistent parts shortages, capacity steadily increased.  Even when manufacturing was fully operational, Saab was still hampered by the disruption of the supply chain as a result of the liquidation phase.

73.     In addition to needing to restart manufacturing following this period, Saab needed to reactivate its sales channels after months of inactivity.  Both of these developments had negative impacts on Saab's financial performance during 2010.

74.     During 2010, Saab had sales of €819.2 million, which was lower than it had predicted in its business plan.

75.     By year's end, as a result of lower than expected sales volumes, heavy investments in product launches and future product development, Saab's financial position became increasingly precarious.

76.     2011 was Saab's most challenging year financially, culminating in its filing for bankruptcy.

77.     By March 2011, Saab had incurred an increasing amount of unpaid debt owed to GM and other vendors and suppliers, which led to a liquidity crunch.  As a result, Saab was unable to make a payment to one of its vendors that provided shipping services to bring parts into Saab's factory.  The shipping vendor refused to bring certain parts into Saab's Trollhättan factory on March 29, 2011, which led to a two-hour interruption in production.

12

5245160

78.     While a two-hour interruption in production would not typically have a major impact on an automobile manufacturer, in this instance, the interruption had a cascading effect. Word of the production interruption spread rapidly among other Saab suppliers and the day following the interruption, Saab was encountering problems with more than 90 of its suppliers resulting from a media frenzy which shook confidence in Saab.

79.     Shortly thereafter, on April 6, 2011, production at the Saab facility was again interrupted, but this time for several weeks.

80.     During the production interruption, Mr. Muller worked to generate the liquidity that Saab would require to restart production.

81.     Initially, Saab reached a tentative funding deal with the Swedish National Debt Office ("NDO"), in which the NDO would release its pledge in the shares of a Saab subsidiary, Saab Automobile Property AB, in order to free up collateral to secure further financing.

82.     However, as a result of a decision by the European Investment Bank, these efforts did not bear fruit, and Saab was forced to pursue other avenues of securing immediate liquidity to resume production.  At this point, Mr. Muller embarked upon intensive efforts to secure funding from potential investors in Saab, including investors based in the People's Republic of China.

83.     GM was fully aware of these efforts through direct communications between Mr. Muller and GM and copious media reports regarding these efforts.  That Mr. Muller turned to the Chinese market to find new investors and secure additional funding was no surprise to GM, particularly in light of the fact that, just a few weeks prior, Mr. Girsky had introduced Mr. Muller to David Xu for this very purpose.

84.     For example, on April 21, 2011, in connection with Mr. Muller's efforts to secure

13

5245160

immediate liquidity, he informed GM, through Mr. Girsky, that "[b]ased on the current property transaction which has already been cleared by the [National Debt Office] and is only subject to [European Investment Bank] approval, we will have an inflow of euro 30M of fresh cash from [another European investor] who is funding the sale and lease back plus euro 29M from a regular [European Investment Bank] drawdown.  Youngman will pay euro 10M within 2 weeks as a down payment on a total of euro 111M of new shares and 20M as a deposit on product.  With that inflow we can start up production and resume activities."

85.    On May 2, 2011, Spyker entered into a €30 million convertible loan agreement with Gemini Investment Fund, Ltd., a first step along the way to restarting production.

86.    As detailed below, from this point through its bankruptcy filing in December 2011, Saab was close to reaching various deals to secure financing or restructure the company. GM created the appearance of initially encouraging Saab to enter into a deal with Chinese investors to save the company, only later to unlawfully pull the rug out from under Saab, driving it into bankruptcy liquidation.  Indeed, it was GM's intent by whatever means necessary to quash any financing or investment deal that could save Saab from liquidation, because GM simply sought to eliminate Saab from competition, particularly in the Chinese automobile market.

**Efforts to Restructure Ownership of Spyker through December 2011**

87.    Following an intense period of negotiation over three days, the first potential transaction that would have saved Saab was an agreement with the Chinese automobile manufacturer Hawtai.  Through the agreement, Saab and Hawtai contemplated a strategic partnership with respect to manufacturing, technology and distribution of Saab automobiles in China.  Saab announced this agreement on May 3, 2011.

88.    The agreement would have secured for Saab medium term funding of €150

14

million.  This funding would have taken the form of a €120 million subjection agreement and a €30 million convertible loan.

89.     Just after Saab announced the potential deal with Hawtai, Mr. Kaminski wrote to Mr. Muller to remind him of Saab's obligations under the ATLA, namely, that Saab would not be able to sublicense GM technology to other parties under the ATLA or assign or otherwise transfer its rights under the ATLA without GM's prior written consent.

90.     Notwithstanding this initial admonition, through communications during the next ten days, GM gave the appearance of being open to, and expressing support for the deal with Hawtai.

91.     Regardless, on May 12, 2011, it became apparent that Hawtai would be unable to secure necessary approvals from the Chinese government and terminated the transaction.  Saab issued a press release announcing that "[a]s a result of this termination, Saab Automobile may enter into a strategic partnership with Hawtai or another Chinese party on manufacturing, technology and distribution in China… To that end, Spyker and Saab Automobile are negotiating equity and debt financing and/or technology licensing with various (strategic) Chinese partners."

92.     Through contemporaneous communications with Mr. Kaminski, Mr. Muller informed GM that Saab was continuing  to attempt to secure the necessary government approvals and, if it was unable to do so, another Chinese company, Youngman, stood ready to enter into a strategic partnership with Saab.  Mr. Kaminski responded, "Victor, Thanks for the update.  Good luck."

93.     Four days after the deal with Hawtai was terminated, Spyker announced that it had been able to enter into a memorandum of understanding with Pang Da.  Under the terms of the memorandum of understanding with Pang Da, it and Saab were to form a strategic alliance

5245160

consisting of a joint venture to distribute Saab automobiles in China on the one hand, and

another joint venture to develop and manufacture new Saab-branded vehicles on the other.  The

memorandum of understanding called for Saab to own 50% of the manufacturing joint venture

with Pang Da and another manufacturing partner splitting the remaining shares.

94.     In addition to the joint ventures, the memorandum of understanding with Pang Da

called for Pang Da to make a €30 million payment to Saab for the purchase of Saab vehicles,

with an expected additional €15 million purchase after thirty days.  The memorandum of

understanding also contemplated that Pang Da would acquire a 24% ownership interest in Saab

Automobile in exchange for €65 million.

95.     Saab announced that, once it received the initial €30 million from Pang Da, it

intended to use those funds to restart production as soon as possible.

96.     The following week, on May 27, 2011, Saab was able to restart production at its

Trollhättan facility.

97.     Mr. Muller also had reached a tentative deal with GM whereby he sought

additional funding to buy out GM's preferred shares in Saab.  On June 4, 2011, Mr. Muller

informed Mr. Kaminski of these negotiations with Pang Da and the other manufacturing partner

contemplated by the memorandum of understanding, Youngman.  Specifically, Mr. Muller

informed Mr. Kaminski that "I am on my way to [H]ong [K]ong to strike a tri-partite deal with

Pang [D]a and Youngman, the latter coming in as the [Chinese National Development and

Reform Commission] approved manufacturing partner and making the capital contribution to

Spyker which will include the $60m for the purchase of the [GM preferred shares]."  Mr.

Kaminski responded "Thank you for the update on your discussions in China."

98.     On June 13, 2011, Spyker announced that it had reached a tentative agreement

16

with Pang Da and Youngman on the structure of the venture going forward.  According to a memorandum of understanding among Spyker, Saab, Pang Da and Youngman, both Pang Da and Youngman would take an equity stake in Spyker.  Pang Da would take a 24% interest and Youngman would take a 29.9% interest in Spyker.  With respect to the contemplated distribution joint venture, Saab and Youngman would each have a 33% interest and Pang Da would have a 34% interest.  With respect to the contemplated manufacturing joint venture, Saab and Youngman would each have a 45% interest and Pang Da would have a 10% interest.

99.     On July 4, 2011, Spyker announced that it had finalized agreements with Pang Da and Youngman, subject to necessary third party and regulatory approvals.  Under the final agreements, the structure of the manufacturing joint venture was changed such that Saab and Youngman would each have a 50% interest.  In announcing the final agreements, Spyker made clear that the manufacturing joint venture would "form[] the foundation for an expansion of the Saab product portfolio with three models which until now did not form part of Saab Automobile's current and future product portfolio.  As such the [manufacturing joint venture] will focus on developing three completely new Saab vehicles: the Saab '9-1', Saab '9-6' and Saab '9-7'."

100.     Aspects of this transaction would require the prior written approval of GM pursuant to the terms of the ATLA.  Through ongoing communications among Messrs. Muller, Kaminski and Millikin, Saab attempted to secure GM's approval.

101.     During the late summer and early fall of 2011, Saab and Spyker continued to seek approval of the transaction from GM.

102.     GM, primarily through Mr. Kaminski, made clear that GM based its denial on the ATLA.

17

103.     Partly as a result of Saab's continuing inability to secure funding during this time, on September 7, 2011, Saab was required to seek the protection of voluntary reorganization under Swedish law.  The District Court of Vänersborg initially rejected Saab's reorganization proposal, but this decision was overturned by an appellate court.  Saab had achieved a temporary reprieve and was able to continue to pursue its reorganization plan.

104.     The administrator appointed to oversee the reorganization immediately traveled to China to meet with Pang Da and Youngman to encourage a collaborative restructuring that would involve development and manufacture of automobiles build on the Saab PhoeniX platform.

105.     Due to GM's ultimate opposition to any of the proposed deals to rescue Saab (allegedly due to GM's concerns over breach of the ATLA), Pang Da and Youngman, in October 2011, failed to confirm their commitment to the subscription agreements and transactions to which they agreed in July.  On October 23, 2011, Spyker therefore announced that it had given notice of termination of those agreements.

106.     In another attempt to stave off liquidation, on October 28, 2011, Spyker, Saab, Pang Da and Youngman entered into a new memorandum of understanding.  Under the new memorandum of understanding, Pang Da and Youngman would purchase 100% of the shares of Saab and Saab Great Britain, Ltd. for €100 million.  Further, Youngman and Pang Da had expressed commitment to provide €50 million to fund Saab while in reorganization and an additional €600 million to restart production, settle Saab's debts and to fund operations through 2013.

107.     However, on November 7, 2011, GM announced that it would not consent to that deal, once again citing to its required consent under the ATLA.  The same day, Spyker

18

announced that it, Saab, Pang Da and Youngman would undertake to propose a structure for the deal that was acceptable to all parties.

108.    On November 11, 2011, Mr. Muller sent an email to Mr. Kaminski enclosing a Power Point Presentation providing information regarding a newly structured transaction contemplated between Spyker, Pang Da and Youngman pursuant to which Youngman would take a 60% ownership interest in Saab, and Pang Da would take a 40% ownership interest. Under this proposed agreement, Youngman and Pang Da would ensure that the restrictions in the ATLA were honored and that Saab would remain in compliance with them.  To that end, as communicated to GM in the Power Point Presentation, under the proposed agreement, no GM technology would be exploited in China.

109.    GM asserted that its prior consent to this proposal was required under the ATLA and refused to consent.

110.    In early December 2011, Spyker proposed yet another potential deal structure to attempt to address GM's stated concerns, including structuring any Chinese investment in Saab to less than thirty percent so as to avoid triggering any change of control provisions in the GM – Spyker contracts.  GM rejected this proposal on December 6, 2011.

111.    Faced with GM's consistent refusal to approve of any deal that would involve Chinese ownership or control of GM licensed technology, Spyker and Saab determined that the only way to avoid imminent bankruptcy liquidation was to structure a deal in such a way that any outside ownership and control would be limited to Saab proprietary technology with no reliance upon the legacy GM technology licensed under the ATLA.

112.    Thus, the deal that was ultimately arranged was structured in such a way as to avoid <u>any</u> implication of the ATLA or any other agreement between GM and Saab; *i.e.*, it did not

require <u>any</u> consent or approval from GM.

### **Spyker Structures Deal with Youngman That Does Not Require GM Consent**

113.    On December 7, 2011, the administrator of Saab's reorganization announced that he had determined to apply to the Vänersborg District Court for termination of Saab's voluntary reorganization.  The administrator made this application because it had appeared that Saab would be unable to obtain the necessary financing to continue with the voluntary reorganization.

114.    Upon information and belief, although GM was not actively participating in the bankruptcy proceeding, GM had been closely coordinating its efforts with the administrator to shut Saab down.

115.    At a minimum, GM was fully aware of Saab's increasingly precarious financial condition, and that liquidation was imminent.

116.    In order to avoid liquidation, it was critical for Saab to reach a deal to secure immediate liquidity in advance of a court hearing on Monday, December 19, 2011, where the Vänersborg District Court would decide whether to terminate Saab's voluntary reorganization proceeding and its concomitant protections from creditors.

117.    GM was aware that, if Saab did not enter into a deal with investors that provided immediate liquidity, Saab would be forced to file for bankruptcy on December 19, 2011.

118.    Against this background, in mid December 2011, Spyker, Saab and Youngman negotiated and finalized for execution the Framework Agreement.  A copy of the Framework Agreement is attached as **Exhibit C**, and its terms are incorporated herein by reference.

119.    So as to avoid any conflict with GM, the Framework Agreement was structured an such a way that Youngman had <u>no</u> participation in either Spyker or Saab in the near term. The Framework Agreement would require Youngman to provide Saab a loan of €200 million, which loan would only be converted into an equity interest in Saab <u>after</u> Saab ceased using GM

5245160

technology in its vehicles.

120.    Under the Framework Agreement, Youngman would have had no access in any way to any GM technology.

121.    Pursuant to the Framework Agreement, Saab and Youngman would have established a joint venue in which each company had an equal interest.

122.    This joint venture would develop future Saab models based upon the PhoeniX platform.

123.    The version of the PhoeniX platform that the joint venture would acquire contained no GM proprietary technology.

124.    The Framework Agreement therefore did not require GM's approval under the ATLA or any other contract between GM, its affiliates, Saab or Spyker.

125.    All negations regarding the Framework Agreement took place between principals of Spyker, Saab and Youngman with authority to agree to and execute the Framework Agreement.

126.    The Framework Agreement was finalized and circulated among Spyker, Saab and Youngman on the afternoon of Friday, December 16, 2011.

### GM Tortiously Interferes with the Youngman – Saab Agreement

127.    Youngman was prepared to execute the Framework Agreement with Saab and Spyker on December 17, 2011.

128.    On December 17, 2011, GM, through its spokesperson James Cain, issued the following statement:

> Saab's various new alternative proposals are not meaningfully different from what was originally proposed to General Motors and rejected.  Each proposal results either directly or indirectly in the transfer of control and/or ownership of the company in a manner that would be detrimental to GM and its shareholders.  As such,

21

GM cannot support any of these proposed alternatives.

129.    At the time that GM issued this statement, GM knew, based upon its communications with Mr. Muller about the Framework Agreement, that the Framework Agreement created a firewall separating existing technology in Saab's current models, including GM technology, from Saab models developed using the PhoeniX platform under the Framework Agreement, and that GM's approval of the transaction was not required as a matter of law.

130.    GM also had this knowledge through its communications with the Swedish media and from other third party sources.

131.    In an interview published on December 17, 2011 by the Swedish daily newspaper TTELA, GM was asked through its spokesperson whether it had information about the Framework Agreement other than through media reports.  GM responded that they had received such information directly from Saab, through the Swedish ambassador, through meetings with the reorganization administrator and from other sources.

132.    During the interview, in response to the question why GM would not approve of the Framework Agreement, GM spokesman James Cain falsely asserted "[i]t is wrong that Saab claims that they can do this deal without consulting us.  We cannot continue to provide Saab with components and manufacture the 9-4x if this proposal remains.  This proposal is similar to other proposals submitted in recent weeks."

133.    GM issued the December 17, 2011 statement and gave the TTELA interview to falsely assert that its approval was required per the ATLA to enter into the Framework Agreement for the purpose of killing the Youngman - Saab deal.

134.    In fact, GM's assertion that its consent was required was a pretext, as GM knew that the PhoeniX platform technology was to be carved out and contributed to the joint venture

with Youngman.  Rather, GM's intent was to kill any deal to save Saab from liquidation because GM did not want Saab to remain a going concern and enter the Chinese market as a potential competitor to its automotive products.

135.     In the TTELA interview, GM stated that the Framework Agreement "is not in our interest in our global operations."  When pressed on what GM meant by "global operations," Mr. Cain responded that GM's activities in China were "particularly important."

136.     Under the Saab Vehicle Supply Agreement, attached as **Exhibit D** and incorporated herein by reference, GM had agreed to supply components and manufacture the Saab 9-4X for Saab through December 2014.

137.     The Saab Vehicle Supply Agreement expressly stated that "[n]either SAAB nor the GM Parties shall have the right to terminate this Agreement for convenience."

138.     Nonetheless, GM, through Mr. Cain, threatened that GM would not continue to provide Saab with GM components or manufacture the Saab 9-4X if Saab entered the Framework Agreement.

139.     Rachel Pang was quoted on December 19, 2011 in press reports that "We [Youngman] were supporting [Saab/Spyker] to the last moment, even up to 1 a.m. this morning we were discussing possible solutions by telephone, but due to GM's position, in the end Sweden's Saab filed for bankruptcy this morning."

140.     Youngman was prepared to execute, and would have executed, the Framework Agreement but for GM's false statements that its consent was somehow required under the ATLA and that, therefore, it would oppose any agreement with Youngman.

141.     On December 19, 2011, having been wrongfully deprived by GM of a means to secure further funding, Saab was forced to file for bankruptcy liquidation.

As a direct and proximate result of GM's wrongful and tortious interference with Saab's and Spyker's economic expectancy in the Framework Agreement, Saab and Spyker have been damaged in an amount not less than $3,000,000,000, representing the value of the Company projected through 2016 under the Framework Agreement.

**COUNT 1**
**Tortious Interference with Economic Expectancy**

142.     Plaintiffs re-allege and incorporate the allegations set forth above as if fully set forth herein.

143.     Despite initial appearances, GM never intended to allow Saab to compete with it in China.  When Saab found a way to secure liquidity and continue as a going concern with the help of Chinese investors, GM was determined to scuttle the deal by any means necessary, including the publication of false information about its rights under the parties' contracts.

144.     As set forth above, Spyker and Saab had a valid business expectancy in the Framework Agreement.

145.     GM had knowledge of the business expectancy from multiple sources.

146.     GM intended to wrongfully interfere with the business expectancy in order to protect itself from competition in the Chinese marketplace.

147.     Based upon the structure of the Framework Agreement, of which GM was aware, GM could not justifiably rely on the ATLA non-assignment provisions or any other contractual provisions to oppose the Framework Agreement, because GM's proprietary technology had been expressly carved out of the Youngman – Saab deal.

148.     GM had no legal basis to assert that its consent to the Framework Agreement was required or to withhold its consent.

149.     GM resorted to making intentionally false statements that GM's consent was

24

5245160

required and that GM would oppose the deal.

150.     GM also wrongfully threatened to breach the Saab Vehicle Supply Agreement if Spyker and Saab entered the Framework Agreement.

151.     As a direct and proximate result of GM's wrongful threats and intentionally false statements, and for no other reason, Youngman did not enter into the Framework Agreement, causing a termination of Spyker and Saab's valid business expectancy and Saab to enter into liquidation.

152.     GM's tortious interference with Saab's and Spyker's economic expectancy in the Framework Agreement has caused Saab and Spyker damages in an amount to be proven at trial, but no less than $3,000,000,000.

## DEMAND FOR A JURY TRIAL

Plaintiffs demand a jury trial on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and a judgment against Defendant as follows:

A.     entering judgment against Defendant and in favor of Plaintiffs for each count alleged in this Complaint;

B.     awarding Plaintiffs compensatory damages in an amount to be determined at trial, but of no less than $3,000,000,000, plus pre- and post-judgment interest, special, punitive, and other allowable damages, as well as Plaintiffs' reasonable attorneys' fees and costs.

C.     retaining jurisdiction for the purpose of enabling Plaintiffs to apply to the Court for such further orders and directions as may be necessary or appropriate for the construction or carrying out of any orders made in this action, for the modification of any such orders, for the enforcement of compliance therewith and the punishment of any violations thereof; and

D.     awarding Plaintiffs all other relief the Court deems just and proper.

25

DATED:  August 6, 2012                    Respectfully submitted,


                                          PATTON BOGGS LLP

                                          */s/ Nigel L. Wilkinson*
                                          Nigel L. Wilkinson
                                          Benjamin G. Chew (application pending)
                                          Andrew Zimmitti (application pending)
                                          Rory E. Adams (application pending)
                                          2550 M Street, N.W.
                                          Washington, D.C.  20037
                                          Tel:  (202) 457-6000
                                          Fax:  (202) 457-6315
                                          nwilkinson@pattonboggs.com
                                          bchew@pattonboggs.com
                                          azimmitti@pattonboggs.com
                                          radams@pattonboggs.com

                                          *Attorneys for Plaintiffs Saab Automobile AB
                                          and Spyker N.V.*

5245160

## VERIFICATION

I, Victor Muller, do hereby declare under penalty of perjury under the laws of the United States of America that I have read the foregoing Verified Complaint, and that the information stated therein is true and correct.


Executed on:   AUGUST 2 2012

Victor Muller
Chief Executive Officer of Saab
Automobile AB and Spyker N.V.

27

5245160