UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAAB AUTOMOBILE AB, *et al.,*

      Plaintiffs,

                                        Case No. 12-cv-13432
                                        Honorable Gershwin A. Drain

v.

GENERAL MOTORS COMPANY,

      Defendant.

_____/

ORDER GRANTING DEFENDANT'S MOTION TO DISMISS [#9]

I. INTRODUCTION

    Presently before the Court is Defendant's Motion to Dismiss. The parties had oral arguments on June 10, 2013. For the reasons that follow, Defendant's Motion to Dismiss is GRANTED.

II. PROCEDURAL AND FACTUAL HISTORY

    Plaintiffs filed this action on August 6, 2012. This case arises from a state-law claim of alleged Tortious Interference with Economic Expectancy. Plaintiff Saab Automobile AB ("Saab") is a company, currently in receivership, organized under the laws of Sweden with its principal place of business in Trollhättan, Sweden. Plaintiff Spyker ("Spyker") is a limited liability company organized under the laws of the Netherlands with its principal place of business in Zeewolde, Netherlands. Spyker is the current parent company to Saab. Defendant, General Motors Company ("GM") is organized under the laws of Delaware with

its principal place of business in Detroit, Michigan.

GM and Saab have a business relationship that goes back to January of 1990 when GM purchased a fifty percent interest in Saab-Scania AB to form Saab Automobile AB. In January of 2000, GM exercised an option to purchase the remaining fifty percent and Saab became a wholly owned subsidiary of GM until February 2010. *See* Compl., Dkt. No. 1, pg. 3; Mot., Dkt. No. 9-1, pg. 7. On February 23, 2010, Spyker purchased Saab from GM and acquired a majority interest in Saab, while GM maintained a minority interest through preferred shares. *Id.*

It is important to note, that the sale – whereby GM transferred ownership and control of the Saab brand to Saab – there were several important agreements made between the parties. *Id.* at 10. One of the agreements, the Automotive Technology License Agreement ("ATLA"), granted Saab a non-exclusive, non-transferable, royalty-free license to make and assemble certain Saab models. The ATLA consisted of GM intellectual property and provided that Saab could not assign, transfer, or delegate any of the rights granted to Saab by GM. *See* Compl., Dkt. No. 1-3, ATLA, ¶ ¶ 4.2 (a), 14.9(a).

More specifically, the ATLA provided that GM was able to terminate the agreement upon written notice to Saab:

> a) if SAAB initiates a sale or transfer of all or substantially all of its assets including to an Affiliate without the prior written consent of [GM];
> b) upon a SAAB corporate decision to liquidate;
> c) if SAAB initiates a direct or indirect Change of Control to an OEM or OEM related entity without the prior written consent of [GM].

*Id.*, ATLA, ¶ 12.3.

A second agreement, in addition to the ATLA between Saab and GM, was the

Vehicle Supply Agreement ("VSA"). The VSA provided that GM would continue to supply Saab with certain vehicles and parts. GM was also entitled to cancel the VSA if Saab "voluntarily enter[ed] bankruptcy, receivership, liquidation, composition of creditors, dissolution or similar proceeding." *See* Compl., Dkt. No. 1-5, VSA, ¶ 9.2 (b). Additionally, GM could terminate the VSA "in the event twenty percent (20%) or more of SAAB becomes owned or controlled, directly or indirectly, by another [OEM] without prior written consent of the GM Parties." *Id.* at ¶ 9.3 (a).

Towards the end of 2010, Saab's financial position "became increasingly precarious." *See* Compl., Dkt. No.1, pg. 12. From May of 2011 until early-December of 2011, in an effort to obtain financial stability, Saab attempted to enter into multiple investment arrangements with Zhejiang Youngman Lotus Automobile Co., Ltd. ("Youngman"), a Chinese manufacturer that produces commercial vehicles, busses, passenger cars, and automobile components. *See* Mot., Dkt. No. 9-1, pg. 3. GM ultimately refused to approve of any agreements that Saab proposed that involved Chinese ownership or control of GM licensed technology. *See Id.*; Compl. Dkt. No. 1, pgs. 17-19.

In an effort to avoid liquidation, Saab attempted to "secure immediate liquidity in advance of a court hearing on Monday, December 19, 2011, by entering into a 'Framework Agreement' with Spyker and Youngman. *Id.* at 20. Saab stated its ultimate goal was to structure the Framework Agreement in a way as to "avoid <u>any</u> implication of the ATLA or any other agreement between GM and Saab; [the Framework Agreement] did not require <u>any</u> consent or approval from GM." *Id.* (emphasis in original).

The unexecuted Framework Agreement was structured where Youngman would have no immediate participation in Saab or Spyker. In fact, Youngman's loan would not be

converted into an equity interest in Saab until after Saab discontinued its use of GM's proprietary technology in all Saab vehicles. *See Id.* at 20-21; *see also* Mot., Dkt. No. 9-1, pg. 9. The Framework Agreement provided for Youngman and Saab to enter into further agreements and commitments as needed with the intent to execute the Framework Agreement by December 19, 2011, or no later than December 31, 2011. *See* Compl., Dkt. No. 1-4, Framework Agreement, pgs. 2-3. There were no fewer than ten separate agreements that were required to be negotiated and entered into in order to successfully close on the Framework Agreement. For example, some of the agreements included: transfer of Saab shares and assets to an entity created by Saab and Youngman called ("JVB") where each own 50% shares, a JVB technology license agreement, a technology services agreement, and a series of China joint venture agreements. *See generally*, Compl., Dkt. No. 1-4, Framework Agreement.

On December 17, 2011, GM spokesperson, James Cain ("Cain") issued a public statement that:

> Saab's various new alternative proposals are not meaningfully different from what was originally proposed to General Motors and rejected. Each proposal results either directly or indirectly in the transfer of control and/or ownership of the company in a manner that would be detrimental to GM and its shareholders. As such, GM cannot support any of these proposed alternatives.

*See* Compl., Dkt. No. 1, pg. 21-22; Mot., Dkt. No. 9-1, pg. 10.

On the same day, Cain was further quoted in a Swedish newspaper stating:

> "[I]t is wrong that Saab claims that they can do this deal without consulting us. We cannot continue to provide Saab with components and manufacture the 9-4x if this proposal remains. This proposal is similar to other proposals submitted in recent weeks."

*See* Compl., Dkt. No. 1 pg. 22; Mot., Dkt. No. 9-1, pg. 10.

It is these statements that Plaintiffs claim were the direct and proximate cause of GM's wrongful and tortious interference with Saab's and Spyker's economic expectancies in the Framework Agreement. Plaintiffs claim that they have been damaged in the amount of $3,000,000,000, representative of the company's projected value through 2016 under the Framework Agreement.

### III. LAW AND ANALYSIS
### A. STANDARD OF REVIEW
### FED R. CIV. P. 12(b)(6)

Federal Rule of Civil Procedure12(b)(6) allows the court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(6). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957). Even though the complaint need not contain "detailed" factual allegations, its "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atlantic*, 550 U.S. at 555).

The court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide "more than labels and conclusions, and a formulaic recitation of the elements

of a cause of action will not do." *Id.* (citations and quotations omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'– 'that the pleader is entitled to relief.'" *Id.* at 679.

### B. Governing Law

GM argues that Saab has styled its complaint as a tort in an effort to avoid choice of law and venue selection clauses that exist in favor of New York in the alleged contracts Saab references in its complaint. *See* Mot., Dkt. No. 9-1, pg. 12. It subsequently concedes to venue in Michigan with the caveat that Michigan's choice-of-law rules are applicable to the facts in this case. *Id.* The Court will now turn to Michigan's choice-of-law rules.

"Because this is a diversity action, the law of the forum State, including the choice-of-law rules, apply." *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009) (citing *Uhl v. Komatsu Forklift Co.*, 512 F.3d 294, 302 (6th Cir. 2008)). "Generally speaking, a tort claim filed in a Michigan court will be governed by Michigan law 'unless a rational reason exists to displace it.'" *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 425 (6th Cir. 2009) (citing *Watkins & Son Pet Supplies v. Iams Co.*, 254 F.3d 607, 611 (6th Cir. 2001) (quoting *Olmstead v. Anderson*, 428 Mich. 1, 25 (1987))). More specifically, "Michigan choice of law

principles provide that Michigan law applies absent a rational reason -- such as another State's interest -- to apply other law." *Daimler-Chrysler Servs. North America, LLC v. Summit Nat'l, Inc.*, 289 F. App'x 916, 921 (6th Cir. 2008) (citing *Sutherland v. Kennington Truck Serv., Ltd.*, 454 Mich. 274, 284 (1997)), cert. denied, 556 U.S. (2009).

GM contends that because the Complaint allegations reference three contracts between GM or its affiliates and Saab, there are thus, three possibilities for governing law in this case: Sweden, New York, and Michigan. *Id.* at 13.

New York: GM argues that New York has an interest in having its law applied in this case. GM points to three contracts Saab attached to its complaint that state New York laws applied to the contracts. *See* Mot., Dkt. 9-1, pg. 14. Moreover, GM asserts that New York laws should govern "the rights of the parties" as allegedly negotiated in a Master Agreement between GM and Saab upon GM's transfer of ownership to Saab. *Id*; *see generally*, Compl., Dkt. No. 9-1.

However, GM concedes that New York and Michigan are not in conflict. And when there is no conflict regarding the law between different states, no need exists to make a choice of law decision. *See In re Aircrash disaster Near Monroe, Mich. On Jan. 9, 1997*, 20 F. Supp 2d 1110, 111 (E.D. Mich 1998); *In re Rezulin Prods. Liab. Litig.*, 390 F. Supp . 2d 319, 330 (S.D.N.Y. 2005). Therefore, the Court will not spend time on this argument in light of GM's concession.

Sweden: GM argues that because Saab is a company organized under the laws of Sweden then Swedish law would apply. Yet, GM takes the position that the type of claim Saab alleges here does not exist under Swedish law. *See* Mot., Dkt. No. 9-1, pg. 13.

Contrarily, Saab argues that presumptively Sweden would have an interest in this

litigation under Sweden law because it would have an interest in protecting its citizens and plaintiffs. *See* Resp., Dkt. No. 15, pg. 14. Saab agrees with GM that in Sweden, this claim would not be cognizable because it does not contain criminal conduct associated with the tortious interference. Unlike GM, Saab concludes that although Sweden may have an interest in this case, Michigan's interest is equally significant. Thus, Saab contends, that under Michigan's choice-of-law rules, Michigan law would apply. The Court agrees with Saab.

To determine if a reason is rational to usurp Michigan law, the Court applies a two-step analysis. First the Court determines whether there is any foreign State that has an interest in having its law applied. "If no State has such an interest, the presumption that Michigan law applies cannot be overcome. . . ." *Miller v. Airborne Express, Inc.*, 2008 U.S. Dist. LEXIS 5451, at *3 (E.D. Mich. July 27, 2008) (citing *Sutherland*, 454 Mich at 286.) Second, if a foreign State does have an interest in having its substantive law applied, the Court must determine whether Michigan's interests mandate that its law be applied despite the foreign State's competing interests. *See Sutherland*, 454 Mich. at 286.

Here, it is undisputed that Sweden has an interest in having its law applied. Saab is a Swedish corporation under receivership in Sweden. One of the two allegedly tortious actions that took place arose out of an interview given to a Swedish newspaper. Even given Sweden's interests in having its law applied, Michigan's interests are equally substantial. GM is located in Detroit and has contacts throughout the state of Michigan. The alleged tortious actions originated from GM's personnel located in Michigan. Thus, as Michigan's "balancing approach most frequently favors using the forum's (Michigan's) law," the Court believes that a proper balance favors the application of Michigan law in this case as well.

*See Hall v. GMC*, 229 Mich. App. 580, 585 (1998).

Michigan: GM begins its Michigan choice of law argument by asserting again that the parties' alleged choice of New York law to govern the overall rights of the parties should be the prevailing law applied in this case. Then this Court, for the same reasons it agreed with GM in its New York choice-of-law argument, agrees that there is no conflict between New York law and Michigan law. And GM concedes that there is no reason for the Court to choose between New York law and Michigan law. *See Infra* pg.7.

### C. Tortious Interference with Economic Expectancy

Saab alleges that GM intentionally interfered with its economic expectancy by making two defamatory statements. The statements were made on December 17, 2011, by James Cain, a GM spokesperson. The first statement was issued in a press release, and the second statement was quoted in an interview published in a Swedish newspaper. The genesis of GM's statements were that GM "cannot support any of the proposed [Saab] alternatives," and that "it is wrong that Saab claims they can do this deal without consulting us." *See* Compl., Dkt. No. 1, pgs. 21-22.

To prevail on a claim of tortious interference with economic expectancy, Saab must prove the following:

> (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant; (3) intentional interference causing or inducing a termination of the relationship or expectancy; and (4) resultant actual damage.

*Maiberger v. City of Livonia*, 724 F. Supp. 2d 759, 776 (E.D. Mich. 2010) (quoting *Lucas*

*v. Monroe County,* 203, F.3d 964, 978-79 (6th Cir. 2000)); *see also Laurence G. Wolf Capital Mgmt. Trust v. Ferndale*, 2009 Mich. App. LEXIS 368, Case No. 282565 at *41-2 (Feb. 19, 2009).

GM raises two arguments as to why they are entitled to dismissal pursuant to Federal Rule of Civil Procedure Rule 12 (b) (6). First, GM argues that the "expectancy" Plaintiffs allege is really agreements to negotiate a series of additional agreements, "all of which were subject to multiple approvals and contingencies, that combine to make the 'expectancy' wholly uncertain as a matter of law." *See* Mot., Dkt. No. 9-1, pg. 18. Second, GM contends that it had the contractual right to approve Saab's proposed transactions with Youngman, and that any statements that it made regarding those rights could not be improper interference as a matter of law. *Id.*

1. <u>Existence of a Valid Business Relationship or Expectancy</u>

GM argues that Plaintiffs fail in their efforts to support the existence of a valid business expectancy. GM asserts that the Framework Agreement illustrates that prior to the deal closing, "Saab and Youngman needed to negotiate and enter into no fewer than ten additional agreements and commitments, as well as seek out and obtain the consent of three separate governments, EU, Sweden, and China." *See Id.* at 31. GM maintains that agreements – yet to be negotiated – would define the contractual relationships and represent the true substance of the business venture between Saab, Youngman, and Spyker. These agreements consisted of, for example, the Chinese joint venture agreement, the merger agreement between Saab and JVB, and the technology licensing agreements from Saab to JVB and Youngman respectively. *Id.*

In addition to obtaining and entering into multiple contractually negotiated agreements, GM maintains that the required regulatory approvals were also significant because the various required governmental approvals were historically not easy to come by. *See* Comp., Dkt. No. 1, ¶¶ 82, 91. Thus, GM argues that Plaintiffs lacked an objectively reasonable expectation that the Framework Agreement and required related agreements would actually come to fruition in the required time frame.

On the other hand, Plaintiffs argue that the unsigned Framework Agreement was the "embodiment of an agreement reflecting months of negotiations and at least four separate written proposals." *See* Resp., Dkt. No. 15, pg. 27. Plaintiffs maintain that, but for GM's wrongful interference, the parties were poised and committed to finalizing their business relationship. Plaintiffs further assert that they only need to show a likelihood that future business would have occurred. Indeed, Plaintiffs contend, the Framework Agreement committed each party to the relationship with immediate and concrete benefits to Saab with the imminent infusion of ten million Euros to continue its operations. *See Id.* at 27.

Under Michigan law, to satisfy the element of a "valid business expectancy," Plaintiffs must show that they had more than a "subjective expectation of entering into a [business] relationship." *See Compuware Corp. v. IBM*, 259 F. Supp. 2d 597, 604 (citing *Grand Rapids Plastics, Inc. v. Lakian,* 1997 U.S. Dist. LEXIS 20371, Case No. 96-cv-73615DT at *35 (E.D. Mich. Nov. 14, 1997)("The expectancy must be a reasonable likelihood or probability, not mere wishful thinking."). Here, the "expectancy" Plaintiffs allege was nothing more than an agreement to negotiate a series of additional agreements. The unexecuted Framework Agreement, by its very designation, is nothing

-11-

more than a strawman; a template created by Saab, Youngman, and Spyker to outline the multitude of agreements and commitments needed to actually execute a final agreement as intended by December 19, 2011, or no later than December 31, 2011. There were no facts presented that indicate that any of the various agreements were close to or in the process of being negotiated or approved. For the Plaintiffs to expect to have all of the necessary agreements closed over a weekend or even in a matter of two weeks seems to have been far reaching at best.

Furthermore, all of the various agreements were subject to the approvals and contingencies of multiple companies and governments. For example, the Chinese joint venture agreement, the merger agreement between Saab and JVB, and the technology licensing agreements from Saab to JVB and Youngman – that combined – all made the "expectancy" rely on what amounted to be the equivalence of a wish list and thus, wholly uncertain as a matter of law. *See* Mot. Dkt. No. 9-1, pg. 31; *see generally*, Compl., Dkt. No. 1-4, Ex. C, Framework Agreement. Even when looking at the facts in the light most favorable to the Plaintiffs, the facts do not support that a valid business expectancy existed. Therefore, this element must fail as a matter of law.

<u>2. Intentional Interference Causing or Inducing a</u>
<u>Termination of the Relationship or Expectancy</u>
*<u>a. Per se wrongful</u>*

To establish the "intentional interference" necessary to prove this element of a tortious interference with a business expectancy claim, the interference must be, "*per se*

-12-

wrongful" or "a lawful act with malice and that is unjustified in law." *Chambers v. City of Detroit*, 786 F. Supp. 2d 1253, 1274-75 (E.D. Mich. 2011)(quoting *Feaheny v. Caldwell*, 175 Mich. App. 291, 302, 437 N.W. 2d 358 (1990)), *overruled in part on other grounds*, *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich. App. 83, 85-6 (2005).

"Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Chambers,* 786 F. Supp. 2d at 1275, (quoting *Mino v. Clio Sch. Dist.*, 255 Mich. App. 60, 78 (2003)).

In fact – the crux of GM's argument is that any comments that it made were justified and predicated on contracts it held with Saab regarding GM's business interest in the use of its technology and could not be *per se* wrongful. *See* Mot., Dkt. No. 9-1, pgs. 26-27. GM further argues that there is nothing wrongful about making public statements expressing its views on a transaction or rights pursuant to a contract. *Id.* at 26. GM contends that it bargained for and obtained rights pursuant to the ATLA and VSA that required its consent in transactions involving Saab that involved the initiation of a change of control or transfer of rights. *Id.* GM maintains that it was presented with several transactions involving Youngman and Saab that acknowledged GM's right to consent; therefore, GM found it implausible for Plaintiffs to suggest that it committed a tort by stating its belief that the deal was not in GM's interest. *Id.*

GM contends that the ATLA specifically gave it the absolute right to terminate the agreement if Saab "*initiated"* a sale of all or substantially all of its assets, or an indirect change of control to an OEM or OEM related entity without GM's prior written consent. *See Id.* at 20-21. GM asserts that the mere initiation of a change of control by Saab

without GM's consent, would trigger GM's right to terminate.

Alternatively, Plaintiffs argue that GM knew that they and Youngman had made a valid and non-infringing agreement. *See* Resp., Dkt. No. 15, pg. 20. Yet, Plaintiffs contend, GM made false and misleading statements on the eve of Saab's reorganization proceeding claiming that the Framework Agreement was "detrimental" to GM and that "GM [could not] support any of these proposed alternatives." *See* Compl. Dkt. No. 9-1, ¶ 128. Plaintiffs contend that GM then stated in a follow-up interview that "[i]t is wrong that Saab claims that they can do this agreement without consulting us." *Id.* at ¶ 132. This statement, Plaintiffs claim, is a "false and misleading public statement affirmatively asserting a right to block a contract [GM] knew it had no such right to block." Resp., Dkt. No. 15, pg. 21. The Court disagrees with Plaintiffs.

Public statements made by GM in reference to legal, bargained- for rights were "motivated by legitimated business reasons" and could not be improper interference as a matter of law. *See Chambers,* 786 F. Supp at 1275, (citing *Mino v. Clio Sch. Dist.*, 255 Mich. App. 60, 78 (2003)). The contract between Saab and GM is clear and unambiguous and the language as written clearly gives GM the right to consent to the agreement if Saab initiates a sale of all or substantially all of its assets, or a direct or indirect change of control to an OEM or OEM related entity. Because Saab *initiated* a change of control in the Framework Agreement that provided for Youngman to acquire 70% of the shares of Saab, in addition to the transfer of all assets related to Saab Engineering and technology and trademark licensing, GM had the contractual right – pursuant to the ATLA – to approve or disapprove of the proposed transaction between Saab and Youngman. In addition to its approval rights, GM had the contractual right to

terminate the VSA. *See* Compl., Dkt. No. 1, pg. 20-21; *see generally*, Compl., Dkt. No. 9-1, Framework Agreement.

"[B]ecause statements that are true are constitutionally protected . . . those statements cannot be the basis of tortious interference with business relations claim." *Hantz Grp. v. Haney*, 2010 Mich. App. LEXIS 2288, Case No. 292954 at *20 (Mich. Ct. App. Nov. 30, 2010). GM's statements were not untrue as Plaintiffs contend. GM merely stated its position pursuant to contracts that it had with Plaintiff. Thus, Plaintiff's claim that GM's conduct was *per se* wrongful fails as a matter of law.

### b. Malice

Because Plaintiffs failed to allege facts that GM's "intentional interference" was *per se* wrongful, they must now establish "a lawful act was done with malice and without justification, . . . with specificity," and that the "affirmative acts by [GM] corroborate the improper motive of the interference." *Power Tools & Supply Inc. v. Cooper Power Tools, Inc.*, 543 F. Supp. 2d 749, 763 (E.D. Mich. 2008) (citing *Mino*, 255 Mich. App. at 78.). GM argues that Plaintiffs have not alleged that it acted with any desire to injure or harm Plaintiffs. *See* Mot., Dkt. 9-1, pg. 28. GM again asserts that it had a legitimate business motive for its conduct: the protection of its business interests.

Contrarily, Plaintiffs argue that GM was not motivated by legitimate business reasons. But instead, GM was motivated by its desire to prevent Saab from becoming a competitor in the Chinese automobile marketplace. *See* Resp., Dkt. No. 15, pg. 14. To that effect, Plaintiffs aver that GM made false and misleading statements on a Sunday with the intention of driving Saab into liquidation at a hearing on the following day. *Id.* at

23. Plaintiff further contends that GM wrongfully interfered with the imminent execution of the Framework Agreement so that it could secure an economic advantage over a "rival manufacturer." All of these acts, Plaintiffs maintain, support their claim that GM acted with malicious intent. The Court finds Plaintiffs reasoning to be unavailing.

GM was driven by legitimate business concerns, protecting its own competitive position and business relationships in China and elsewhere, actions for which there can be no improper motive or interference. *See Mino*, 255 Mich. App. 60, 78. ("Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference."). Plaintiffs have not alleged a single affirmative act to corroborate that GM's motive in making the two statements was anything other than a legitimate business reason but rather an intent to interfere with Plaintiffs' business relationship.

Instead, Plaintiffs make conclusory statements to that effect. For example, Plaintiffs' Complaint alleges: " GM issue[d] the December 17, 2011, statement and gave the . . . interview to falsely assert that its approval was required per the ATLA to enter into the Framework Agreement for the purpose of killing the Youngman-Saab deal; and GM's intent was to kill any deal to save Saab from liquidation because GM did not want Saab to remain a going concern and enter the Chinese market as a potential competitor to its automotive products." *See* Compl., Dkt. No. 1, ¶¶ 133-34.

Furthermore, Plaintiffs were being disingenuous to conclude that GM's motives were malignant and that the statements GM made were false relating to its approval being needed for Saab to move forward with the Framework Agreement. There were clearly contracts in place between GM and Saab where the parties negotiated that:

"Saab may not assign or otherwise transfer its rights or delegate its obligation under this Agreement without the prior written consent of [GM]," *See* Compl., Dkt. No. 1-3, pg. 21, ¶ 14.9 (b); *see also* Compl., Dkt. No. 1, ¶ 66; GM was entitled to terminate the VSA "in the event twenty percent (20%) or more of SAAB bec[a]me owned or controlled, directly or indirectly, by another [OEM] without the prior written consent of the GM Parties," Compl., Dkt. No. 1-5, pg. 18, ¶ 9.3 (a); and that GM could terminate the ATLA "if SAAB initiates a sale or transfer of all or substantially all of its assets including to an Affiliate without the prior written consent of [GM]," or "if SAAB initiates a direct or indirect Change of Control to an OEM or OEM related entity without the prior written consent of [GM]." Compl., Dkt. No. 1-3, pg. 18-19, ¶ 12.3 (a)(c).

GM had several, legitimate contractual business reasons to make the statements it made. Plaintiffs have failed to allege "specific, affirmative acts" to corroborate that GM had an improper motive. *Power Tools & Supply Inc.*, 543 F. Supp. 2d at 763. As such, Plaintiffs have not show that they are entitled to relief on the theory of tortious interference with economic expectancy. *Twombly*, 550 U.S. at 555.

IV. CONCLUSION

For the foregoing reasons, the Court will GRANT GM's Rule 12 (b) (6) Motion to Dismiss [#9].

SO ORDERED.

Dated: June 18, 2013 /s/Gershwin A Drain
GERSHWIN A. DRAIN
United States District Judge